DAVID R. CALLAWAY (CASBN 121782)
Glenn Agre Bergman & Fuentes
44 Montgomery Street
Suite 2410
San Francisco, CA 94104
Tel: (415) 599-0884
E-mail: dcallaway@glennagre.com

JEREMY D. BLANK (CASBN 172571)
Law Office of Jeremy D. Blank
1459 18th Street, No. 148
San Francisco, CA 94107
Tel: (415) 710-2728
Email:  jdb@jeremyblank.com

Attorneys for Defendant
SCOTT SHAW

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | No.  CR 22-00105-BLF |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM** |
| v. | |
| SCOTT SHAW, | **Date:**   November 14, 2023 |
| Defendant. | **Time:**   9:00 a.m. |
| | **Court:**  Courtroom 3 – Fifth Floor |

Defendant Scott Shaw submits the following memorandum concerning the appropriate sentence in this matter.

## I.    INTRODUCTION

Despite the overheated rhetoric that has been directed at him since the USA Today published an article entitled, "San Jose State Reinvestigates Claims Athletic Trainer

Inappropriately Touched Swimmers" on April 17, 2020, https://www.usatoday.com/in-depth/news/investigations/2020/04/17/san-jose-state-reinvestigates-trainer-claims-sexual-misconduct/5138353002/, Scott Shaw comes before the Court for sentencing after having pleaded guilty to two *misdemeanor* counts of violating 18 U.S.C. § 242, violation of civil rights under color of law. The plea was pursuant to a plea agreement following a mistrial on six such misdemeanor counts. *See* ECF #187. The plea agreement does not include Sentencing Guidelines calculations or a sentencing range. *See id.*

Unfortunately, the opprobrium against Mr. Shaw also apparently influenced the drafter of the Presentence Report ("PSR"), whose offense narrative and Guidelines calculations appear to reflect a "close enough for government work" mentality, instead of the dispassionate and careful investigation required by Rule 32 of the Federal Rules of Criminal Procedure.

For the reasons explained in this memorandum, Mr. Shaw respectfully submits that a sentence of no greater than twelve months' imprisonment, the low-end of the properly calculated Sentencing Guidelines range, is appropriate in his case.

## II.    FACTS MATERIAL TO MR. SHAW'S SENTENCING

### A.    Mr. Shaw's Personal History

Mr. Shaw agrees that the personal history set forth in paragraphs 56 to 76 of the PSR is accurate. As a supplement to that personal history information, Exhibit A is a statement by Mr. Shaw that provides the Court a more complete personal history, as well as a further expression of his sincere remorse for the harm that he has caused.

### B.    The Offense Conduct

Mr. Shaw's offense conduct, as reflected in the plea agreement and supported by testimony from the student-athletes at trial, included the following:

During the fall semester of 2017, Mr. Shaw treated I.S., a member of the women's water polo team, for a left shoulder injury. Although he was not her team's assigned trainer, Mr. Shaw treated I.S.'s shoulder several times. On one occasion while treating her, Mr.

Shaw began massaging the back of her shoulder and neck, and then moved his hands down and touched the side of her left breast. He did not touch I.S. under the sports bra she was wearing at the time.

During the 2017-2018 and 2018-2019 academic years, Mr. Shaw treated J.M., a member of the women's water polo team. Although he was not her team's assigned trainer, Mr. Shaw treated J.M.'s shoulder injury several times. While doing so on one occasion, he applied pressure to both sides of her neck and worked his hands down to her chest, and then touched her breast, including her areola, under her clothing with his bare hand. On another occasion, while "cracking" J.M.'s back, he touched her buttocks under her clothing with his bare hand.

During the spring semester of 2019, Mr. Shaw treated A.L., a member of the women's water polo team. Although he was not her team's assigned trainer, Mr. Shaw treated A.L. to address an injury to her shoulder. While treating that injury, Mr. Shaw touched A.L.'s breast under her clothing with his bare hand. She immediately "flinched" and turned away, and the session ended at that point.

During the 2019-2020 academic year, Mr. Shaw treated K.B., a member of the women's soccer team, on two occasions. On the first occasion, K.B. sought treatment for back pain, and, after tucking her jersey into her sports bra in order to examine her spine, Mr. Shaw grazed the side of her breasts, over her sports bra, while bringing his hands back to her spine. After palpating down her spine, K.B. testified that Mr. Shaw "cupped" her buttocks. On another occasion, K.B. asked Mr. Shaw to apply electrotherapy patches known as "stim pads" to treat her back pain. She testified that he touched her buttocks under her clothing with his bare hands while placing two of the stim pads.

C.    The Presentence Report

Mr. Shaw has no objection to the factual representations set out in the PSR concerning his personal history, medical condition, and employment background. He very much disagrees, however, with the PSR's narrative of the offense, as well as with the legal

conclusions and resulting Sentencing Guidelines calculations. The PSR incorrectly concludes that Mr. Shaw's conduct constituted crimes of "abusive sexual contact," as such contact requires evidence of sexual intent. The PSR's conclusions that sexual intent was established are conclusory, unsupported by the evidence presented at trial, and contrary to law.

Following the disclosure of the draft PSR, counsel for Mr. Shaw delivered a letter to the probation officer objecting, in detail, to the draft PSR's summary of Mr. Shaw's offense conduct and to the selection of the Sentencing Guideline for "abusive sexual contact" as the appropriate underlying offense for the Guidelines calculation. Counsel's 11-page letter objecting to the draft PSR is filed as Exhibit B to this sentencing memorandum.

The primary focus of Mr. Shaw's objections to the draft PSR – and to the final product that leaves almost all of those statements unchanged – is that the probation officer chose to rely, apparently exclusively, on FBI interview summaries rather than on the actual testimony adduced, under oath, from those same witnesses at trial. That is lazy and sloppy. Such shortcuts should not be countenanced by this Court in a matter of this importance, as it is axiomatic that trial testimony, given under oath and subject to full cross-examination, is more reliable than subjective law enforcement summaries of witness interviews. *See, e.g., Crawford v. Washington*, 551 U.S. 35, 61 (2004) ("The [Confrontation] Clause thus reflects a judgment, not only about the desirability of reliable evidence (a point on which there could be little dissent), but about how reliability can best be determined."). The PSR's reliance on interview summaries over conflicting sworn and cross-examined trial testimony is therefore clearly improper.

Rule 32(f)(3) of the Federal Rules of Criminal Procedure provides a mechanism to resolve objections to the report:

> After receiving objections, the probation officer may meet with the parties to discuss the objections. The probation officer may then investigate further and revise the presentence report as appropriate.

1  Or, as happened here, the probation officer can give the back of the hand to the defendant's

2  detailed objections and, without bothering to confer with the parties, summarily dispense

3  with those objections by writing something like this:

4       The probation officer declines to make the changes requested by
        defense counsel. The probation officer is not limited to trial

5       testimony when summarizing the offense conduct in the
        presentence report; rather, the probation officer can consider any

6       information relevant to sentencing *that meets the preponderance
        of the evidence standard.*

7

8  PSR Addendum at ¶ 7 (emphasis added).

9       Well, that is the entire point, isn't it? The probation officer does not say *how* she

10 arrived at the conclusion that FBI agents' interview summaries meet "the preponderance of

11 the evidence standard," when the information conveyed in those summaries is contrary to

12 sworn trial testimony regarding the exact same subject. It should (but perhaps doesn't) go

13 without saying that Rule 32 does not provide for a less-rigorous presentence investigation

14 simply because the defendant has admitted to inappropriately touching female student-

15 athletes.

16      The PSR's cavalier dismissal of the trial testimony is egregious in a number of places

17 that are extensively described in Exhibit B. But perhaps the most blatantly irresponsible

18 example of this preference for older FBI interview reports over more recent sworn

19 testimony involves the pretrial statements of J.M. In a line from J.M.'s first FBI interview

20 summary, the agent relates J.M.'s statement that Mr. Shaw had touched her "nipple." PSR ¶

21 14. As Exhibit B makes clear at pp. 5-6, however, J.M. *recanted* this allegation. She later

22 explained, both to the FBI and in her trial testimony, that she had initially misspoken; she

23 meant that Mr. Shaw had touched some part of her areola, and that she had previously "kind

24 of counted the whole thing as [her] nipple." Trial Transcript ("Tr.") 438:11-22.

25      Mr. Shaw realizes that, in one sense, this doesn't matter: whether he touched J.M.'s

26 "nipple" or "areola" without her consent, it is still a battery under the law if done without a

27 legitimate diagnostic or treatment purpose. Maybe the probation officer figured so what,

28

close enough. But that is not how a Rule 32 presentencing investigation is supposed to work; the officer is required to make at least some effort to get the facts right. That she did not do so here, when the error was so clearly drawn to her attention in a formal submission with citations to the trial transcript, is, to put it mildly, disappointing.

"A district court may not simply rely on the factual statements in a PSR when a defendant objects to those facts." *United States v. Showalter*, 569 F.3d 1150, 1160 (9th Cir. 2009) (citing *United States v. Ameline*, 409 F.3d 1073, 1085 86 (9th Cir. 2005) (en banc)). In addition, the Court's factual findings must be supported by the record. *See, e.g., United States v. Spangle*, 626 F.3d 488, 497 (9th Cir. 2010). Here, the record, consisting of the victims' testimony at trial, establishes Mr. Shaw's offense conduct far more reliably than FBI reports, and this Court should – indeed, must – rely on that testimony, not on the unsupported conclusions set forth in the PSR.

Accordingly, Mr. Shaw asks that the Court order that all references in the PSR to Mr. Shaw's offenses constituting sex crimes or "abusive sexual conduct," and the PSR's unsupported speculation as to Mr. Shaw's sexual intent, be stricken. Such conclusory statements are not supported by the record. Leaving them in, without a preponderance of the evidence basis to support them, could well affect Mr. Shaw's security level and placement, should the Court choose to commit him to the custody of the Bureau of Prisons.

## III.   GUIDELINES CALCULATIONS

As the PSR notes, Mr. Shaw disputes the Guidelines calculations in the PSR. Specifically, he maintains that the proper base offense level is 7 pursuant to § 2H1.1, the specified Guideline for violations of 18 U.S.C. § 242, and cross-referencing to § 2A2.3. Moreover, the PSR's recommended enhancement for committing the offenses of conviction while the victims were in Mr. Shaw's "custody, care, or supervisory control" is improper, as that enhancement is not a specific offense characteristic for either § 2H1.1 or the underlying offense guideline, § 2A2.3.

1    The correct Combined Offense Level is 13, not 20, and the correct sentencing range

2    is 12-18 months, not 33-41 months.

3        A.    <u>The Base Offense Level Should Be 7, not 12</u>

4        The Sentencing Guideline for violations of 18 U.S.C. § 242 is U.S.S.G. § 2H1.1. *See*

5    U.S.S.G. § 2H1.1, Cmt. That section provides that the base offense level is the greater of

6    "the offense level from the offense guideline applicable to any underlying offense" – in this

7    case, for reasons we will get to in a moment, that level is 7. *See* U.S.S.G. § 2H1.1(a)(1).

8        The PSR recommends using "abusive sexual contact," in violation of 18 U.S.C.

9    section 2244, as the underlying offense, but this makes no sense in light of the offenses of

10   conviction, the testimony adduced at trial, and the instructions given to Mr. Shaw's jury.

11   When applying section 2H1.1(a)(1), the

12       "**Offense guideline applicable to any underlying offense**"
13       means the offense guideline applicable to any conduct
         established by the offense of conviction that constitutes an
         offense under federal, state, or local law (other than an offense
14       that is itself covered under Chapter Two, Part H, Subpart 1)
         [. . .] The determination of the applicable alternative base
15       offense level is to be based on the entire conduct underlying the
         count of conviction (i.e., the conduct taken as a whole).

16

17   U.S.S.G. § 2H1.1, Application Note 1 (emphasis in original).

18       The offense conduct here does not meet the elements of "abusive sexual contact,"

19   i.e., the offense the PSR incorrectly asserts is the "underlying offense." The Guideline for

20   crimes of "abusive sexual contact" refers to the crimes defined in 18 U.S.C. § 2244

21   ["Abusive Sexual Contact"]. *See* U.S.S.G. § 2A3.4, Cmt. "Sexual contact" is defined as "the

22   intentional touching, either directly or through the clothing, of the genitalia, anus, groin,

23   breast, inner thigh, or buttocks of any person *with an intent to abuse, humiliate, harass,*

24   *degrade, or arouse or gratify the sexual desire of any person*." 18 U.S.C. § 2246(3)

25   (emphasis added).

26       In Mr. Shaw's case, there is no evidence that the offenses of conviction involved any

27   specific intent to abuse, humiliate, harass, degrade, or arouse or gratify the sexual desire of

28

anyone. In fact, the government forcefully and repeatedly argued, and this Court ruled, that

the charged offenses did not require sexual intent, and that the only intent required was to

violate the victims' Due Process privacy rights by intruding on their bodily integrity.

The Court will recall that the defense argued strenuously before trial that the

government should have to prove that Mr. Shaw engaged in the charged conduct for his

own "sexual gratification." The government took a contrary position:

> **The United States need not prove that Defendant engaged in the conduct charged in the Information for his own sexual gratification** in order to prove that Defendant deprived the alleged victims of their right to bodily integrity by engaging in the conduct charged in the Information. The case law . . . makes clear that the standard for determining whether the right to bodily integrity has been violated is whether the conduct is so egregious and so outrageous, that it may fairly be said to shock the contemporary conscience. This is true regardless of whether Defendant engaged in the conduct for his own sexual gratification.

ECF #85 at p.73 (emphasis added).

In briefing filed in support of its proposed First Amended Jury Instructions, the

government continued to assert that

> a non-consensual touching with no legitimate medical purpose may also shock the conscience – even if the touching was not done with an explicit sexual intent. **Defendant attempts to create a "sexual intent" where none is required by controlling case law**, and this theory of intent should be rejected for the reasons discussed more thoroughly with respect to Disputed Instruction No. 46.

ECF #134 at pp.74-75 (emphasis added).

According to the government, Mr. Shaw was therefore not entitled to an instruction

on sexual or any other specific intent and, the government insisted, the defense's proposed

instruction on the elements of a section 242 violation "**improperly incorporates a sexual

intent requirement that is not necess**ary in order to find that Defendant acted willfully in

violating the charged victims' right to bodily integrity." ECF. #134 at p.81 (emphasis

added).

DEFENSE SENTENCING MEMORANDUM

The Court ultimately agreed with the government, denied Mr. Shaw's request for an instruction on sexual intent, and instead instructed the jury that to convict Mr. Shaw it need only find that he "not only had a generally bad or evil purpose, but also . . . the specific intent to deprive the persons named in the Information of their constitutional right to bodily integrity." The instruction goes on to say that "one may be said to act willfully if he acts in open defiance or in reckless disregard of a known and definite constitutional right – in this case, the right to bodily integrity." ECF #151 at p.53 (Jury Instruction No. 46). In effect, the Court held that the only intent required to violate section 242 was to violate the victims' constitutional right to bodily integrity – that is, their privacy – by recklessly or intentionally touching them in an "outrageous" manner.

And, under the law, "outrageous" does not equate to "sexual." Nor is every touching of an intimate area by definition "sexual," as a quick cross-reference to the analogous California statute makes clear. As noted in Exhibit B, it is important to remember that Mr. Shaw was able to be charged federally only because he was a trainer at a publicly funded university; had he been a trainer at Santa Clara University instead of San José State University, no federal criminal liability would have attached to his conduct. Since his liability hinges on his employment by the State of California, it seems only fair that the Court should look to California law to determine whether touching an "intimate area" is per se "sexual."

It is not. California Penal Code section 243.4(e)(1), also a misdemeanor, is the statute most analogous to the conduct alleged here, and it reads (emphasis added):

> Any person who touches **an intimate part of another person**, if the touching is against the will of the person touched, **and is for the specific purpose of sexual arousal, sexual gratification, or sexual abuse**, is guilty of misdemeanor sexual battery, punishable by a fine not exceeding two thousand dollars ($2,000), or by imprisonment in a county jail not exceeding six months, or by both that fine and imprisonment.

In short, the analogous California statute requires (1) touching of an "intimate part of another person," *and* (2) that it be for "the specific purpose of sexual arousal, sexual

DEFENSE SENTENCING MEMORANDUM

1  gratification, or sexual abuse." The California statute does not automatically equate

2  touching of an "intimate area" with sexual intent; a conviction requires both the touching

3  *and* the intent.

4      This Court's rulings that the charged offenses do not require a sexual intent, nor the

5  intent to "oppress, humiliate or degrade" the victims, resulted in there being no evidence

6  adduced at trial concerning *why* Mr. Shaw touched intimate areas on the victims' bodies –

7  although, to the extent such testimony was adduced, the four student-athletes who were

8  named in the charged counts were unanimous in testifying that Mr. Shaw *never* made sexual

9  overtures to them, *never* tried to meet them off-campus, *never* made suggestive comments,

10 *never* appeared to be "breathing hard," etc.

11     Returning to the jury instructions, the government successfully argued that a

12 violation of section 242 could be based on a "reckless" invasion of the victims' privacy by

13 touching those areas of their bodies without their consent. Abusive sexual contact, in

14 contrast, requires "intentional touching" with a sexual or abusive intent. *See* 18 U.S.C. §§

15 2244, 2246. To now find that the evidence at trial proved that Mr. Shaw committed a sex

16 crime requiring sexual intent, when he was denied the opportunity to present evidence on

17 that issue – and where the evidence that was adduced points to the exact opposite

18 conclusion, i.e., that whatever may have motivated Mr. Shaw's actions, it was definitely *not*

19 sexual intent – would violate his right to a fair sentencing proceeding.

20     Significantly, the PSR points to only one witness's testimony to justify using the

21 "abusive sexual conduct" guideline to set the base offense level, namely, the testimony of

22 L.F., one of the government's four "propensity" witnesses. *See* PSR at Addendum, ¶ 13.

23 However, any conduct by Mr. Shaw during his treatment of L.F. – which the PSR

24 acknowledges "is not alleged to have occurred with any of the charged victims" (*id.*) – is

25 not within his "offense of conviction" conduct and therefore is not properly considered

26 when selecting the base offense level.

27

28

DEFENSE SENTENCING MEMORANDUM

1    As noted previously, the commentary to § 2H1.1 states: "'Offense guideline
2  applicable to any underlying offense' means the offense guideline applicable to any conduct
3  *established by the offense of conviction* that constitutes an offense under federal, state, or
4  local law." U.S.S.G. § 2H1.1, Application Note 1 (emphasis added). Similarly, U.S.S.G. §
5  1B1.2, which governs the Court's selection of the Guidelines applicable for determining the
6  base offense level, instructs that the Court should "[d]etermine the offense guideline section
7  in Chapter Two (Offense Conduct) applicable to the offense of conviction (i.e., *the offense*
8  *conduct charged in the count of the indictment or information of which the defendant was*
9  *convicted*). U.S.S.G. § 1B1.2(a) (emphasis added). Only after "determining the appropriate
10  offense guideline section pursuant to subsection (a) of this section" should the Court assess
11  "relevant conduct" to "determine the applicable guideline range." *See* U.S.S.G. § 1B1.2(b).
12  As the Ninth Circuit has noted, § 1B1.2(a) "instructs courts on what 'offense of conviction'
13  means when '[d]etermin[ing] the offense guideline section . . . applicable to the offense of
14  conviction.' In this context, a conduct-based definition makes perfect sense." *United States*
15  *v. Wei Lin*, 841 F.3d 823, 826 (9th Cir. 2016) (internal citations omitted).

16    The phrase "'offense of conviction' is not defined under the definitions section of the
17  Guidelines." *United States v. Rebman*, 321 F.3d 540, 543 (6th Cir. 2003). However,
18  numerous courts have analyzed the Guidelines as a whole – including the definition of
19  "offense of conviction" provided in Section 1B1.2(a) – "and determined that the phrase
20  'offense of conviction' describes only the precise conduct constituting the crime for which
21  the defendant was convicted and does not include non-offense relevant conduct." *Rebman*,
22  321 F.3d at 543-44; *see also United States v. Holbert*, 285 F.3d 1257, 1261 n.3 (10th Cir.
23  2002) ("The Sentencing Guidelines do not specifically define 'offense of conviction,' but
24  indicate that the phrase encompasses only facts immediately related to the specific offense
25  for which the defendant was convicted."); *United States v. Pressler*, 256 F.3d 144, 157 n.7
26  (3d Cir. 2001) (finding that the phrase "'offense of conviction' includes only the substantive
27  crime for which a particular defendant was convicted").

28

- 11 -

Any conduct by Mr. Shaw related to L.F. is certainly not established by either of the two offenses to which Mr. Shaw has pleaded guilty, nor is any conduct pertaining to L.F. described in the plea agreement. The Court therefore may not base its selection of the "underlying conduct" offense guideline on conduct that was not part of the two counts of conviction.

This would be true even if L.F.'s testimony about Mr. Shaw were remotely credible, which it was not. L.F. claimed at trial that she could feel Mr. Shaw becoming sexually aroused as he performed a hamstring stretch that, if performed as she described it, would have made feeling what she said she felt a physical impossibility. Moreover, L.F. testified that she immediately told her very best friend (Tr. 633:19-22) about the incident (648:20-650:2), but the best friend testified unequivocally, on both direct and cross-examination, that L.F. never told her any such thing and that she definitely would have remembered it if L.F. had told her. *See* Tr. 1407:6-1408:4 and 1413:14-1414:15 ("I think I would remember if someone was, you know, violated by somebody else. I think that's a memory that sticks." Tr. 1413:21-23). Finally, L.F. described the person who performed this impossible stretch on her hamstring as having worn "football shorts" (Tr. 610:19-20), which another witness, Mr. Shaw's longtime colleague, testified Mr. Shaw never wore to work. Tr. 1740:6-8.

In sum, suffice it to say that, of the eight student-athletes who testified, L.F. stands out as the one whose testimony should absolutely *not* be relied upon for any determinations relevant to the sentencing decision, especially when the Commentary to U.S.S.G. makes it clear that "underlying offense" refers to "the offense of conviction," and not to so-called relevant conduct (such as L.F.'s impossible and discredited testimony).

As a result, the PSR's conclusion that "the offense of conviction" constituted a violation of 18 U.S.C. § 2244 is baseless. The probation officer's view that Mr. Shaw should be sentenced as if he committed a sex crime with which he was not charged, rather than a crime based on an invasion of privacy with which he was charged, seems to be driven by a belief that the penalty for a section 242 violation is insufficiently draconian.

1    According to the PSR, Mr. Shaw has not demonstrated "true acceptance of
2    responsibility" because his attorneys have argued "that a sexual intent was not proven at
3    trial nor admitted by the defendant" and have "suggest[ed] that deprivation of bodily
4    integrity is not as serious or damaging" as the crime of abusive sexual contact. See PSR at
5    Recommendation at 2. It is the Sentencing Commission, however, not Mr. Shaw or his
6    counsel, that has determined that a violation of 18 U.S.C. § 242 warrants a lower offense
7    level than a violation of 18 U.S.C. § 2242, and Mr. Shaw's acceptance of responsibility
8    should not be called into question simply because his attorneys – who, not for nothing, are
9    performing the role the Sixth Amendment requires of them – insist on a proper application
10   of the sentencing statutes and guidelines.

11       Mr. Shaw submits that the most clearly analogous "underlying offense" here is
12   battery. See Cal. Penal Code § 242; Judicial Council of California Criminal Jury Instruction
13   No. 960 (2021 ed.) (elements of misdemeanor battery are a non-consensual touching that is
14   "harmful" or "offensive" and done without legitimate purpose); see also U.S.S.G. § 2A2.3,
15   Application Note 2 ("This section applies to misdemeanor assault and battery"). Battery
16   committed under color of state law is "actionable under the due process clause of the
17   Fourteenth Amendment" as "the liberty protected by that clause includes bodily integrity."
18   *Alexander v. DeAngelo*, 329 F.3d 912, 916 (7th Cir. 2003). "The right to one's bodily
19   integrity is 'infringed by a serious, as distinct from a nominal or trivial, battery.'"
20   *Pantastico v. Dept. of Education*, 406 F.Supp. 3d 865, 878 (D.Haw. 2019), quoting
21   *Alexander*, 329 F.3d at 916; see also *K.O. v. Monrovia Unified Sch. Dist.*, 2023 U.S. Dist.
22   LEXIS 143817 (C.D. Cal. 2023) (battery consisting of a teacher grabbing and squeezing the
23   neck of a young child violated the child's due process right to bodily integrity).

24       However, if the Court agrees, as it should, that the offense underlying Mr. Shaw's
25   misdemeanor civil rights offenses is battery, then the Court must apply U.S.S.G. § 2A2.3.
26   The base offense level for battery involving physical contact is 7. *See* U.S.S.G.
27   § 2A2.3(a)(1). This is one offense level higher than the base offense level under

28

DEFENSE SENTENCING MEMORANDUM

§ 2H1.1(a)(4) for violations of 18 U.S.C. section 242, so § 2A2.3 applies.

Returning then to § 2H1.1, the base offense level of 7 is increased by 6 levels
because Mr. Shaw was convicted of acting under color of law. *See* U.S.S.G.
§ 2H1.1(b)(1). Thus, before any adjustment for acceptance of responsibility or "grouping"
under § 3D1.1, the sum of the base offense level plus specific offense characteristics equals
13.

B.    The Proposed Enhancement Under Guidelines Section 2A3.4(b)(3) Is Improper

The PSR recommends two-level enhancements to the offense level for both counts of
conviction because the victims were "in the custody, care, or supervisory control of the
defendant."  PSR ¶¶ 28, 34. This specific offense conduct enhancement is only found,
however, in U.S.S.G. § 2A3.4 (Abusive Sexual Contact); it is not found in § 2A2.3
(Assault/Battery). Because the Guideline that applies to Mr. Shaw's "offense of conviction"
is § 2A2.3, not § 2A3.4, the "custody, care, or supervisory control" enhancement is
inapplicable.

Even if § 2A3.4 *did* apply, the two-level increase for a victim "in the custody, care,
or supervisory control of the defendant" under § 2A3.4(b)(3) should not be added. The
examples in the Commentary – "teachers, day care providers, baby-sitters, or other
temporary caretakers" – assume minor victims. Indeed, counsel has located no case
applying this enhancement to circumstances such as these, in which competent adult
women, all in full possession of their faculties, were being seen by a trainer. To the
contrary, the cases uniformly appear to apply to children. *See U.S. v. Miller*, 293 F.3d 468
(8th Cir. 2002) (victim 5-11 years old and referred to defendant as "Dad."); *U.S. v.
Chasenah*, 23 F.3d 337 (10th Cir. 1994) (upholding § 2A3.4(b)(3) enhancement where
defendant was married to the minor victim's grandmother, was regarded as the victim's
grandfather, and lived in the same house); *U.S. v. Balfany*, 965 F.2d 575, 585 (8th Cir.
1992) (applying § 2A3.1(b)(3) in sexual abuse of 8-year-old to defendant who "effectively

was S.N.'s stepfather"); *U.S. v. Castro–Romero*, 964 F.2d 942, 944 (9th Cir. 1992) (upholding § 2A3.4(b)(3) enhancement where defendant was 8-year-old victim's stepfather).

A second reason not to apply the enhancement is that it smacks of double-counting. It should be remembered that there was no other way for the government to charge Mr. Shaw federally for this contact except by alleging that he acted under "color of law" based upon his state employment. It is therefore fundamentally unfair to hale Mr. Shaw into federal court based on his status as a trainer for a public university and apply an upward adjustment because that same role purportedly placed adult student-athletes into his "custody, care, or supervisory control."

C.  Acceptance of Responsibility

Although the PSR recommendation, as described above, purports to call into question whether Mr. Shaw has "demonstrated a true acceptance of responsibility for his actions" – again, this dig is based, inappropriately, on Mr. Shaw's attorneys doing their actual job – the Guidelines calculations themselves include a two-level reduction for acceptance of responsibility. PSR ¶ 45. The defense, of course, agrees.

U.S.S.G. § 3E1.1(a) provides that a district court may grant a two-level reduction in the offense level "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense." Here, Mr. Shaw was charged with, and pleaded guilty to, violations of 18 U.S.C. § 242, not section 2244 or any other sex crime, and he has clearly demonstrated acceptance of responsibility for those charged offenses.

Mr. Shaw was not convicted of any offense at trial. Despite that, he has now accepted responsibility and thereby spared both the government and the victims a second trial. He has also expressed remorse and acknowledged that his actions caused the victims serious emotional pain. The PSR correctly recommends this reduction.

//
//

D.     <u>Final Guidelines Calculations</u>

Applying §§ 2H1.1 and 2A2.3 yields the following calculation:

- Base offense level of 7;
- 6 levels **added** for acting under color of law;
- 2 levels **added** for "grouping" (*see* PSR ¶¶ 40-43); and
- 2 levels **subtracted** for acceptance of responsibility,

resulting in a Combined Offense Level of 13.

Mr. Shaw's Criminal History Category is I. PSR ¶¶ 50-51. This results in a recommended Guidelines range of 12-18 months' imprisonment, in Zone C of the Sentencing Table. See U.S.S.G. Chp. 5 Pt. A.

Because Mr. Shaw's correct Guidelines range is 12-18 months, and not the 33-41 months as incorrectly calculated in the PSR, the recommendation that the Court sentence Mr. Shaw to consecutive terms on the two counts of conviction (PSR ¶ 82) is not applicable. A low-end sentence of 12 months' imprisonment is within the statutory maximum for a violation of 18 U.S.C. § 242, and a consecutive sentence is therefore not recommended under the Guidelines. *See* USSG §§ 5G1.2(c) and (d).

## III.   **MR. SHAW'S APPROPRIATE SENTENCE**

The defense suggests that a sentence of no greater than twelve months' imprisonment, followed by a term of supervised release, with a condition of counseling, would be appropriate, for the following reasons:

A.     <u>Under the Parsimony Provision, the Court Must Impose a Sentence That is Sufficient but Not Greater Than Necessary to Achieve the Goals of Sentencing</u>

Section 3553(a) requires courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." 18 U.S.C. § 3553(a); *see also United States v. Ranum*, 353 F. Supp. 2d 984, 986 & n.1 (E.D. Wisc. 2005). This has

come to be known as "the parsimony provision." *United States v. Jimenez-Beltre*, 440 F.3d 514, 525 & n.8 (1st Cir. 2006).

The parsimony provision requires courts to impose the minimum sentence necessary to accomplish the purposes enumerated in paragraph (2). Paragraph (2) lists those purposes as:

- To reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

- to afford adequate deterrence to criminal conduct;

- to protect the public from further crimes of the defendant; and

- to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2); *see also United States v. Gall,* 552 U.S. 38 (2007).

The Court must also consider the "need to avoid unwarranted sentence disparities among defendants . . . ." 18 U.S.C. § 3553(a)(6). According to the United States Sentencing Commission, "unwarranted disparity is defined as different treatment of individual offenders who are similar in relevant ways, or similar treatment of individual offenders who differ in characteristics that are relevant to the purposes of sentencing." U.S. Sent. Comm., *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System Is Achieving the Goals of Sentencing Reform*, p.113 (2004).

In light of the presence of significant mitigating factors, Mr. Shaw respectfully requests that the Court sentence him to a sentence no greater than 12 months' imprisonment, the low-end of the applicable Guidelines range.

B.    Mr. Shaw Is Not a Typical Civil Rights Violator

Although misdemeanors, the charged offenses in this case are undoubtedly serious, and Mr. Shaw has accepted responsibility for his actions and deeply regrets his conduct. Mr. Shaw, however, is far from a typical offender.

1    Mr. Shaw's atypicality begins with the fact that, so far as the defense has been able to

2    find, no athletic trainer has ever been federally prosecuted for these sorts of offenses based

3    on the fact that he worked for a public university. This prosecution was therefore, by

4    definition, a stretch, "federalizing" conduct that has only ever been prosecuted in state

5    court. (The Court will recall this argument was strenuously, though unsuccessfully, pressed

6    by the defense in its motion to dismiss. *See* ECF #31, 34.) That Mr. Shaw was unfortunate

7    enough to be chosen to break this new ground already means that he has been punished

8    more than similarly situated persons who were not prosecuted by their local authorities.

9    A district court may certainly consider whether the defendant fits the profile of a

10   "typical" offender in its consideration of an appropriate sentence for a certain class of

11   offense. *See United States v. Autery*, 555 F. 3d 864, 874 (9th Cir. 2009). Appellate courts

12   must give "due deference to the district court's decision that the § 3553(a) factors, on a

13   whole, justify the extent of the variance." *Id.* at 865. In *Autery*, the defendant was convicted

14   of possession of child pornography, the court deviated from the range altogether and

15   sentenced the defendant to no period of incarceration and five years of probation. *Id.* In

16   upholding the variance, the Ninth Circuit upheld the district court's sentence, finding it

17   appropriate that the trial court considered the defendant's various positive characteristics,

18   such as the defendant not fitting the profile of a pedophile and the absence of any history of

19   significant criminality. The court also found that the sentence imposed, which included

20   additional terms such as the maximum period of five years of probation, restrictions on the

21   defendant's movements, requiring him to participate in mental health counseling and take

22   medications as directed, prohibiting him from having direct or indirect contact with children

23   under 18, and barring him from using any computer except for work, took into account "the

24   seriousness of the offense, respect for the law, and just punishment." *Id.* at 875-876.

25   Despite the tone and recommendations of the PSR, the Court must bear in mind that

26   Mr. Shaw is a 56-year-old defendant who has been convicted of two misdemeanors in his

27   first and only contact with the criminal justice system. Mr. Shaw's age and his lack of prior

28

DEFENSE SENTENCING MEMORANDUM

1  criminal history, combined with the fact he will never again work in the field of physical
2  therapy or medicine, strongly suggest that he poses zero risk of recidivism.

3  And lest it be argued that Mr. Shaw should not be treated as a first offender because
4  of the prior allegations against him, the response is that he should not be punished more
5  harshly because San Jose State University, which investigated the allegations against him in
6  2009-2010, cleared him, with the only caveat being an informal agreement that he not work
7  with female swimmers. (The PSR incorrectly states, PSR ¶ 10, that there was an "informal
8  agreement" that Mr. Shaw would not work with *any* female athletes, but this, like so many
9  statements in the PSR, is unsupported by any evidence, let alone any evidence adduced at
10 trial. The reality is that Mr. Shaw continued, openly and without objection, to work with
11 female athletes in every sport except swimming.)

12 The fact that Mr. Shaw is so unlikely to reoffend bolsters the conclusion that he does
13 not pose a danger to society. A brief sentence of imprisonment and of supervision and
14 conditions of release, and other conditions that the Court deems necessary and appropriate
15 would assure the Court that Mr. Shaw will not engage in further crimes. The proposed
16 sentence would serve as substantial punishment, resulting in a sentence sufficient but not
17 greater than necessary, as required by 18 U.S.C. § 3553(a).

18 C.   Letters Attest to Mr. Shaw's Good Character

19 Attached for the Court's consideration as Exhibit C are ten letters and character
20 references in support of Mr. Shaw. The writers of all of these letters – whether family,
21 friends, or professional colleagues – uniformly evidence their understanding of what Mr.
22 Shaw has been accused and convicted of, and they write to give their impressions of his
23 character with that understanding clearly in mind.

24 One distinctive thread that runs through these letters is that Scott Shaw is a man
25 who consistently goes above and beyond to support his friends and family, and to help his
26 community. One could say that Scott is a quintessentially small-town boy who always
27 returned to his home soil.

28

DEFENSE SENTENCING MEMORANDUM

1   Mr. Shaw worked on his family farm and nearby farms from youth through high

2   school. He attended Washington State University after he graduated, aided by a scholarship

3   from the Seattle Mariners. Exhibit A at p.3. After he moved to California to pursue his

4   chosen career, he consistently returned to his hometown to help run charity basketball and

5   poker tournaments; to assist local athletic coaches; and to help out his 83-year-old mother,

6   who still lives on the family farm in Chimacum but traveled to San Jose to be by her son's

7   side throughout his trial. He has promoted and contributed to a scholarship fund so that

8   other students from Chimacum can attend his alma mater to study his chosen profession of

9   athletic training. He has returned home so he could attend his niece's athletic events and

10   offer training to their coaches.

11   Mr. Shaw has also been supportive of the professional development of both his male

12   and female colleagues. Dr. Ellen Payne speaks eloquently of how Mr. Shaw befriended her

13   when she worked as a *per diem* athletic training in 2006, and how he supported her as she

14   grew in professional stature. Dr. Payne relates that Mr, Shaw would go out of his way,

15   geographically and figuratively, to volunteer as an athletic trainer support for grueling

16   multi-day breast cancer walks. His long-time friend and colleague Michael Chisar's letter

17   speaks to Mr. Shaw's responsiveness and concern for the coaches and student-athletes he

18   served, and his volunteering as an examiner and model for the NATA national examination.

19   His friend Lance Gatter's letter relates how Mr. Shaw encouraged his daughter to attend San

20   Jose State, opened his house to them so she could tour the university, and set up weekend

21   appointments with colleagues so she could learn about opportunities at SJSU.

22   Uniformly, these letters speak to the passion and dedication Mr. Shaw brought to the

23   profession that he chose while still in high school, which he practiced for more than 30

24   years, and which he will of course never practice again.

25   //

26   //

27   //

28

DEFENSE SENTENCING MEMORANDUM

D.   <u>A Lengthy Prison Sentence Is Not Required to Provide Adequate Deterrence Under 18 U.S.C. § 3553(a)(2)(B)</u>

The empirical evidence is unanimous that there is no relationship between sentence length and general or specific deterrence, regardless of the type of crime. *See* Andrew von Hirsch et al., *Criminal Deterrence and Sentence Severity: An Analysis of Recent Research* (1999) (concluding that correlations between sentence severity and crime rates were not sufficient to achieve statistical significance, and that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects. . . . Three National Academy of Science panels, all appointed by Republican presidents, reached that conclusion, as has every major survey of the evidence."); David Weisburd et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995) (finding no difference in deterrence for white collar offenders between probation and imprisonment); Donald P. Green & Daniel Winik, *Using Random Judge Assignments to Estimate the Effects of Incarceration and Probation on Recidivism among Drug Offenders*, 48 Criminology 357 (2010) (study of over a thousand offenders whose sentences varied substantially in prison time and probation found that such variations "have no detectable effect on rates of re-arrest," and that "[t]hose assigned by chance to receive prison time and their counterparts who received no prison time were re-arrested at similar rates over a four-year time frame").

The Sentencing Commission has found that "[t]here is no correlation between recidivism and guidelines offense level . . . . While surprising at first glance, this finding should be expected. The guidelines offense level is not intended or designed to predict recidivism." U.S. Sent'g Comm'n, *Measuring Recidivism:  The Criminal History Computation of the Federal Sentencing Guidelines*, at 15 (2004) ["U.S. Sent'g Comm'n, Measuring Recidivism"]. According to "the best available evidence, . . . prisons do not

reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011).

In short, empirical evidence does not support incarcerating Mr. Shaw to further the goal of deterrence.

E.    As An Older Person with Health Problems, Incarceration Will Be More Punitive for Mr. Shaw

Mr. Shaw is 56 and suffers from hypertension and sleep apnea. See PSR ¶ 64.

In May 2015, the Office of the Inspector General issued a comprehensive report on medical care within the Bureau of Prisons and the question of how the prison system handles an aging population. The results were not surprising. The Bureau of Prisons is "ill-equipped" to deal with the unique needs of the aging and ill population behind its walls. In summary, the OIG found

> that aging inmates are more costly to incarcerate than their younger counterparts due to increased medical needs. We further found that limited institution staff and inadequate staff training affect the BOP's ability to address the needs of aging inmates. The physical infrastructure of BOP institutions also limits the availability of appropriate housing for aging inmates. Further, the BOP does not provide programming opportunities designed specifically to meet the needs of aging inmates. We also determined that aging inmates engage in fewer misconduct incidents while incarcerated and have a lower rate of re-arrest once released; however, BOP policies limit the number of aging inmates who can be considered for early release and, as a result, few are actually released early.

U. S. Dept. of Justice, Office of the Inspector General, *The Impact of an Aging Inmate* (Feb. 2016).

Since the inception of the Sentencing Guidelines, the Commission has acknowledged that home confinement is a "form of punishment" that may be "equally efficient" as incarceration for an elderly and infirm defendant. *See* USSG § 5H1.1. Indeed, the same prison sentence for an older offender amounts to harsher punishment than that for a young or middle-aged offender, because the sentence is a greater proportion of an older offender's

1    remaining life and can amount to a life sentence. *See* Hannah T.S. Long, *The "Inequality"*

2    *of Incarceration*, 31 Colum. J. L. & Soc. Probs. 321, 343-44 (1998) (suggesting that prison

3    sentences be adjusted for life expectancy due to age and illness).

4          Defendants' health problems before and during incarceration "accelerate their aging

5    processes to an average of 11.5 years older than their chronological ages after age 50." *See*

6    U.S. Dept. of Justice, National Institute of Corrections*, Correctional Health Care:*

7    *Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates*, at 10 (2004).

8    Those who committed their first crime after the age of 50 "have problems adjusting to

9    prison since they are new to the environment, which will cause underlying stress and

10    probable stress-related health problems," and they are "easy prey" for more experienced

11    inmates. *Id.* at 10. For older prisoners who are unfamiliar with prison culture, "the prison

12    sentence represents nothing short of a disaster, a catastrophe, and, in consequence, they are

13    often in a psychological state of trauma." Elaine Crawley & Richard Sparks, *Older Men in*

14    *Prison: Survival, Coping, and Identity, in The Effects of Imprisonment,* 343, 346-47 (Alison

15    Liebling & Shadd Maruna, eds., 2005).

16          A 56-year-old inmate with Mr. Shaw's health problems is likely to suffer greater

17    punishment than the average inmate because the Bureau of Prisons often fails to provide

18    adequate or even necessary medical treatment. In this case, it is uncertain whether Mr. Shaw

19    will be allowed to use a CPAP machine in custody, despite the importance of that treatment

20    to his cardiac health.

21          F.      There Is Zero Need to Protect the Public from Mr. Shaw

22          Another purpose of sentencing is to "protect the public from further crimes of the

23    defendant." 18 U.S.C. § 3553(a)(2)(C). This purpose turns on "'the likelihood that [the

24    defendant] will . . . commit crimes in the future,'" *United States v. Burroughs*, 613 F.3d

25    233, 243 (D.C. Cir. 2010) (internal citation omitted), and is a function of two variables:

26    predicting the likelihood that the offender will commit further offenses and assessing the

27    potential seriousness of those offenses. *See United States v. Boyd*, 475 F.3d 875, 877-78

28

1  (7th Cir. 2007) (observing that "[d]angerousness is a function of the magnitude of the harm

2  that will occur if danger materializes and the probability that it will materialize").

3       In *Autery*, the Ninth Circuit stated the following regarding the government's

4  argument, which the dissent adopted, that the defendant could receive adequate

5  rehabilitation in prison:

6         The dissent argues that the district court failed to articulate
       exactly why effective outpatient psychiatric treatment cannot be

7         provided in a federal prison. We believe this criticism is
       misguided . . . the dissent seems to overlook the fact that the

8         sole objective of § 3553(a)(2)(D) is not punishment, but the
       defendant's rehabilitation.  Second, the dissent points to no

9         authority, nor to anything in the record, that would undermine
       the district court's conclusion that professional, out-patient

10         (non-institutional) psychiatric treatment would be most effective
       at rehabilitating Autery.

11

12  *Autery*, 555 F.3d at 877; *see also United States v. Tapia-Romero*, 523 F.3d 1125, 1126 (9th

13  Cir. 2008) (noting that when imposing sentence, district court must recognize that

14  "imprisonment is not an appropriate means of promoting correction and rehabilitation")

15  (quoting 18 U.S.C. § 3582(a)).

16       In *Tapia v. United States*, 564 U.S. 319 (2011), the Supreme Court held that section

17  "3582(a) precludes sentencing courts from imposing or lengthening a prison term to

18  promote an offender's rehabilitation." *Id.* at 335. In so deciding, the Court looked to both 18

19  U.S.C. § 3582(a) and 28 U.S.C. § 994(k).

20       Section 3582(a) specifies the "factors to be considered" when a court orders

21  imprisonment. That section provides: "The court, in determining whether to impose a term

22  of imprisonment, and, if a term of imprisonment is to be imposed, in determining the length

23  of the term, shall consider the factors set forth in section 3553(a) to the extent that they are

24  applicable, recognizing that imprisonment is not an appropriate means of promoting

25  correction and rehabilitation."

26       A similar provision addresses the Sentencing Commission in its capacity as author of

27  the Sentencing Guidelines. The Sentencing Reform Act instructs the Commission to "ensure

28

that the guidelines reflect the inappropriateness of imposing a sentence to a term of

imprisonment for the purpose of rehabilitating the defendant or providing the defendant

with needed educational or vocational training, medical care, or other correctional

treatment." 28 U.S.C. § 994(k). According to the Supreme Court, when these provisions are

read together they ensure that "[e]ach actor at each stage in the sentencing process receives

the same message: Do not think about prison as a way to rehabilitate an offender." *Tapia*,

564 U.S. at 330.

The Court in *Tapia* went on to note that probation and supervised release, as opposed

to imprisonment, were the proper places for rehabilitation and treatment:

> Equally illuminating here is a statutory silence – the absence of
> any provision granting courts the power to ensure that offenders
> participate in prison rehabilitation programs. For when Congress
> wanted sentencing courts to take account of rehabilitative needs,
> it gave courts the authority to direct appropriate treatment for
> offenders. Thus, the SRA instructs courts, in deciding whether
> to impose probation or supervised release, to consider whether
> an offender could benefit from training and treatment programs.
> See 18 U.S.C. § 3562(a); § 3583(c). And so the SRA also
> authorizes courts, when imposing those sentences, to order an
> offender's participation in certain programs and facilities. §
> 3563(b)(9); § 3563(b)(11); § 3563(a)(4); § 3583(d). As a
> condition of probation, for example, the court may require the
> offender to "undergo available medical, psychiatric, or
> psychological treatment, including treatment for drug or alcohol
> dependency, as specified by the court, and [to] remain in a
> specified institution if required for that purpose." § 3563(b)(9).
>
> If Congress had similarly meant to allow courts to base prison
> terms on offenders' rehabilitative needs, it would have given
> courts the capacity to ensure that offenders participate in prison
> correctional programs. But in fact, courts do not have this
> authority . . .

*Tapia*, 564 U.S. at 330-331.

Mr. Shaw submits that in his case, should the Court decide that counseling aimed at

rehabilitation is appropriate, such counseling in the context of supervised release – rather

than in prison – would be more productive. The need for rehabilitative counseling thus

warrants a longer period of supervised release with a condition of therapy or counseling, not

an increased term of imprisonment.

IV.     **CONCLUSION**

A sentence of no greater than twelve months' imprisonment, followed by a term of supervised release, with a condition of counseling, is amply sufficient to meet the sentencing goals set out in § 3553(a).

Dated: November 7, 2023

s/ David R. Callaway
David R. Callaway

s/ Jeremy D. Blank
Jeremy D. Blank

Attorneys for Defendant
SCOTT SHAW

DEFENSE SENTENCING MEMORANDUM