# EXHIBIT B



David Callaway
dcallaway@glennagre.com
44 Montgomery Street, Suite 2410
San Francisco, CA 94104
415.599.0884

October 25, 2023

<u>By Email</u>

Melissa Moy
U.S. Probation Officer Specialist
San Francisco, CA 94102
Melissa_Moy@canp.uscourts.gov

Re: <u>United States v. Scott James Shaw, CR 22-00105 BLF</u>

Dear Officer Moy:

This letter responds to the draft Presentence Report and is submitted in compliance with Criminal Local Rule 32-4. I want to begin by thanking you for the thoughtful and thorough interview you conducted with Mr. Shaw, and for your kindness and professionalism throughout the presentence process to date, including graciously allowing me a much-needed extra day to respond to the draft report.

As you will see, this letter includes substantial suggested changes to the draft report, including changes to the summary of the offense conduct and statements of the student-athletes (which were clearly taken from their FBI 302 interviews and not from their actual trial testimony), but most importantly to the calculation of the sentencing guidelines. As I will explain, I believe that the draft report incorrectly relies on U.S.S.G. §2A3.4 (Abusive Sexual Contact), when a more straightforward and correct calculation would rely solely on §2H1.1.

Thanking you in advance for considering them, here are my comments:

**The Offense Conduct**

¶ **8.** We request that you change the word "vaginal" in the first sentence to "groin," to make clear that none of those 17 women reported that Mr. Shaw touched their vaginas.

Glenn Agre Bergman & Fuentes LLP
New York
San Francisco
glennagre.com

USPO Melissa Moy
October 25, 2023
Page 2 of 11



**GLENN AGRE BERGMAN & FUENTES**

¶ **11**. Mr. Shaw was suspended *with* pay. The July 7, 2020 letter begins: "The purpose of this letter is to inform you that you are temporarily suspended with pay (i.e., placed on administrative leave) from your position as Director of Sports Medicine and Head Athletics Trainer . . ."[1]

¶ **13**. I will be repeating this comment as we make our way through the summary of the student-athletes' statements, but it is clear that you relied on the FBI interview reports to draft them. In many cases – I█████ S█████ is certainly one of them – the sworn and transcribed trial testimony of the student-athletes differed quite markedly from the FBI's summary, rendering the draft narrative materially inaccurate.

First, Ms. S█████ did not testify that Mr. Shaw touched **both** of her breasts; she only testified (and demonstrated to the jury) that he touched one side (her left, as she presented with tightness in her left shoulder[2]). Second, Ms. S█████ did not testify that Mr. Shaw touched **under** her sports bra. As a result, this statement in paragraph 13 -- "*Then, without warning, he moved his hand down under her sports bra, touching her left breast and then her right breast.*" -- is incorrect. Here is her actual testimony:

> Q. And did the defendant's fingers go inside your bra at any time?
>
> A. I'm not sure of that. I only remember, like, feeling skin to skin.
>
> Q. Okay. And when you felt that skin on skin, was the touching on your breast tissue?
>
> A. Yes.

\*\*\*

---

[1] I assume you have a copy of this letter. Please let me know if you do not and I would be happy to send it.

[2] "Q. The purpose of your time there with him was to get some treatment for your shoulder; is that right? A. Yeah, the back of my left shoulder was pretty tight." Trial Transcript ("Tr.") at 559:7-9.

Glenn Agre Bergman & Fuentes LLP
New York
San Francisco
glennagre.com



> Q. And did the defendant put his hands inside your bra when he was touching your breast on the side?
>
> A. No.
>
> Tr. 564:7-13 and 564:24-565:1.

Even a relatively minor detail, such as *why* Ms. S▇▇ removed her shirt, is mischaracterized. The draft reads: "*During a treatment session, I.S. removed her shirt at Shaw's request . . . .*" Here is the actual testimony:

> Q. Did you have a t-shirt on when you arrived at YUH or something covering your sports bra?
>
> A. Yeah, a t-shirt.
>
> Q. Okay. But you took it off before you started working with the defendant?
>
> A. Yes.
>
> Tr. 559:24-560:4.

Ms. S▇▇ never testified that Mr. Shaw *asked* her to take her shirt off.

More broadly, by relying on the FBI reports instead of reading the trial testimony, and then highlighting specific details from those reports that were not reflected in the testimony, the draft creates a misleading impression that a single incident in which Mr. Shaw touched the side of Ms. S▇▇'s left breast (again, it was one, not both breasts) was akin to a sneak attack ("*without warning*").

The draft report also fails to provide any context for Mr. Shaw's actions, and the context is extremely important (as we will see later when we turn to the Guidelines calculations). Ms. S▇▇ testified that she saw Mr. Shaw for treatment somewhere between five and fifteen times (Tr. 557:24-558:9), that the breast-touching occurred on only *one* such occasion, and that each time Ms. S▇▇ was seen by Mr. Shaw, he spent significant time with her and that his treatments were helpful:

Glenn Agre Bergman & Fuentes LLP
New York
San Francisco
glennagre.com

USPO Melissa Moy
October 25, 2023
Page 4 of 11


GLENN AGRE BERGMAN & FUENTES

> Q. [. . .] I want to slow down a little bit and talk about all of the things that Mr. Shaw did when he was giving his treatments to you.
>
> So you said he would start out at your head, kind of the base of your skull? [. . .] Would he kind of take his thumbs and sort of dig them in, kind of at the base of your skull to (indicating) – and he would hold that pressure until something released, right? [. . .] The goal was to have a release of the muscle, right?
>
> A. Yes.
>
> Q. And so that wasn't, like, a quick press? That was hold it for, you know, 20 seconds maybe? Does that sound about right?
>
> A. Yeah.
>
> Q. And then he would move down to your neck and do sort of the same thing, so it's just a couple inches lower from the base of your skull, he's now pressing on your – on the back of your neck and, again, holding that press with both thumbs (indicating); right?
>
> A. Yes.
>
> Q. And your head and neck would feel better after he did that; right?
>
> A. Yeah.
>
> Tr. 577:13-578:12.

In sum, the draft, as it pertains to Ms. S▓▓▓▓, focuses on a single incident, using inflammatory language that materially mischaracterizes the conduct that was related to the jury by this witness under oath. This is not your fault, as I'm sure you were only sent FBI 302 reports and not trial transcripts.[3] But still, it needs to be fixed. A more accurate summary would be:

---

[3] When a case resolves by a guilty plea, as most do, relying on agents' reports is fine—it's all you have to go on. But when that same witness testifies at trial, I respectfully suggest that best practice would be to insist on receiving trial transcripts, and not just FBI interview summaries, from the government.

**Glenn Agre Bergman & Fuentes LLP**
New York
San Francisco
glennagre.com

USPO Melissa Moy
October 25, 2023
Page 5 of 11



> I█████ S█████[4] was a member of SJSU's water polo team who sought treatment from Shaw during the fall semester of 2017 for knots in her left shoulder. She testified that she saw Shaw for treatment somewhere between 5 and 15 times. On each of those occasions, she would lie on the training table, face up, while Shaw applied pressure, first to the base of her skull, then to her neck, and then to her trapezius (upper shoulder) muscles, before moving down to her armpit/chest area.[5] During one of those sessions, Ms. S█████ testified that Shaw touched her breast tissue, but that he did not place his hands under her sports bra. Ms. S█████ was a freshman at the time this occurred and was new to sports medicine. Other than her experience with her team trainer, she had no prior experience with athletic trainers. Ms. S█████ testified that Shaw did not tell her ahead of time that he would be touching her breast tissue, nor did he ask for her consent or explain why he was doing so.

This summary avoids being unnecessarily inflammatory and, unlike the current draft, is derived from Ms. S█████'s trial testimony.

**¶ 14.** The summary of J█████ M█████'s testimony suffers from similar infirmities, as it is based on FBI interview summaries that are inconsistent with Ms. M█████'s trial testimony. But in this case the draft also fails to mention that Ms. M███ clarified to the FBI on June 23, 2023, well before trial, that she misspoke when she previously stated that Mr. Shaw had touched her "nipple" and that she instead meant to denote her "areola":[6]

> Q. And you had initially misidentified to the FBI and said that he had touched your nipple and you later clarified that it wasn't your nipple, it was your areola, right?

---

[4] There is no need to refer to Ms. S█████ by her initials. She is an adult who testified at trial under her full name. Her identity is a matter of public record.

[5] "Q. Okay. And in the, in the armpit are or a little bit further down (indicating)? A. Armpit area." Tr. 562:13-15.

[6] There is one confusing answer in the transcript that might suggest otherwise, but it was the fault of a sloppy and leading question by the AUSA (and a too-slow objection by yours truly): "Q. And did – specifically on your boob, did he touch your areola or nipple area? A. Yeah." As I will explain in a moment, the "or" in that answer meant yes to "areola" and no to "nipple."

**Glenn Agre Bergman & Fuentes LLP**
New York
San Francisco
glennagre.com

<a>
<b></b>
</a>



GLENN AGRE BERGMAN & FUENTES

> A. Yeah. I mean, I just kind of counted the whole thing as your nipple. So I didn't clarify exactly what it was, because I just, like, assumed that it was the whole thing.
>
> Q. Okay. And then you later told them that it was – you later understood the difference and clarified for them that it was –
>
> A. Yeah.
>
> Q. Farther away than –
>
> A. Yep.
>
> Tr. 438:11-22.

As you can see, even this testimony was not as clear as one might like, but it is apparent that Ms. M▇ is affirming what she told the FBI before trial, namely, that Mr. Shaw never touched her nipple.

¶ 15. The final sentence ("J.M. was initially hesitant to report Shaw's conduct because she felt she could not prove what happened") should be deleted. She did not testify about this at all. She responded to the question, "Did you ever tell anybody at the time . . . about the defendant touching your breast or areola," by testifying, "I probably mentioned it to my partner [K▇] at the time." Tr. 420:10-13. She added that she did not get into specifics because she "didn't want to, like, make a big deal about it." Tr. 420:21-22.

¶ 17. The second sentence reads: "During a treatment session, Shaw began massaging the front of A.L's[7] breast." That is incorrect. Ms. L▇ did not use the word "massaging." To the contrary, she described the treatment by saying that he first applied "pretty firm" pressure [Tr. 1373:1-4] to the "armpit" area [Tr. 1374:21], and that he continued "pressing" [Tr. 1374:24], and that at some point he placed his "like, three" fingers inside her sports bra [Tr. 1375:8-13].

On cross-examination, she clarified that the pressure was "softer" when he put his fingers inside her sports bra, but also stated that she immediately

---

[7] Again, there is no need to use her initials.

Glenn Agre Bergman & Fuentes LLP
New York
San Francisco
glennagre.com



"flinched" and Mr. Shaw pulled his hand out: "I flinched away pretty quickly, so I think he didn't have too much time to put more pressure if he needed to." Tr. 1383:2-18.

¶ 18. This paragraph also differs materially from the testimony that was given at trial. Ms. B███ never testified that Mr. Shaw placed his fingers "underneath her sports bra in direct contact with the bottom of both her breasts." Nor did she testify that Mr. Shaw did this "without warning." By importing those words into the narrative, you are (unintentionally, I have no doubt) using words that were written by an FBI agent and making them sound as if Ms. B███ said them, which she did not—at least not to the jury, under oath.

What Ms. B███ actually said, and demonstrated for the jury on a mannequin in the courtroom, is that, after tucking her shirt into the back of her sports bra, Mr. Shaw "made his way around, tucking the shirt up and in (indicating)," and "as he was leaving, it was one of these (indicating)," which the AUSA described for the record as "kind of dragging your hand on the side of your breast." Tr. 511:9-17. But Ms. B███ later used the words "*grazing* my breast" to describe the motion Mr. Shaw made when he brought his hands back after tucking in the front of her jersey. And she stated that there was no "skin-to-skin contact" involved in that "grazing" action. Tr. 532:16-533:6.[8]

¶ 19. There are two things wrong with the second sentence: First, the use of the words "without warning" once again imports an FBI agent's words into the mouth of a witness who, testifying under oath, never uttered them. Nor did Ms. B███ say that Mr. Shaw "used great pressure for several seconds" to apply the stim pads to her buttocks.

Ms. B███' objection to Mr. Shaw's conduct was that he used his entire hand to place two electric stimulation pads under her shorts and onto her buttocks,

---

[8] It might also behoove you to read page 534, line 10, through 535, line 9, in which I asked Ms. Burns a series of questions, as I did to each of the four athletes who were named in the charged counts, whether there was anything "sexual" about the contact. She responded (as did each of the three others) that there was not: no "groping," no rubbing, no sexual commentary, no evidence of sexual excitement, etc. *Id.*

whereas her other trainer applied them using only their fingers so as not to have any skin-to-skin contact. Tr. 519: 13-20.

> Q. So the objection there . . . is that if Mr. Shaw had just pressed with his fingers on the stim pad, then no part of his hand would have touched your rear end; right?
>
> A. Correct.
>
> Q. And that because he pressed them with his full hand, part of his hand that wasn't cupping – that wasn't covered by the pad was touching your bare bottom; right?
>
> A. Yes.
>
> Tr. 539:19-540:2.

Ms. B▮▮▮ also did not testify that Mr. Shaw's conduct "made her feel denigrated and violated" (although she did say it made her "upset" [Tr. 521:13]), nor did she testify that "because he was the head athletic trainer, she did not think anyone would believe her if she reported him." That is, once again, an FBI agent's words being placed into the mouth of a witness who, testifying under oath, did not say them. The conduct used to decide Mr. Shaw's sentence should be the conduct to which the witnesses testified under oath, not a report based on the notes of an agent.

### Offense Level Computation

Turning now to the Sentencing Guidelines calculations, I respectfully submit that the draft report incorrectly relies on U.S.S.G. §2A3.4 (Abusive Sexual Contact), when a more straightforward and correct calculation would rely solely on §2H1.1. I believe the mistake here is assuming that Mr. Shaw's conduct was "sexual" when, to the contrary, there was *zero* testimony presented at trial that it was.[9] Mr. Shaw's conduct was inappropriate, but it was neither "abusive" nor "sexual," and I have not found any cases in which conduct as minimal as the misdemeanors

---

[9] I refer here to the four athletes named in the charged counts, and specifically to J▮▮▮▮▮▮ M▮▮▮▮ and K▮▮ B▮▮▮, who are the athletes charged in the two counts to which Mr. Shaw has pleaded guilty.

Glenn Agre Bergman & Fuentes LLP
New York
San Francisco
glennagre.com



charged here was sentenced under that Guideline. The three cases in the Ninth Circuit that cited to §2A3.4(a)(3), all involving serious felonies, are: (1) *United States v. Joey,* 845 F.3d 1291 (9th Cir. 2017) (defendant, a "repeat and dangerous sex offender," was convicted of violating 18 U.S.C. § 2244(a)(5)(knowingly causing a person under twelve years old to engage in sexual acts); (2) *United States v. Swank,* 2016 WL 8674587 (D. Montana, December 16, 2016)(criminal sexual abuse of a seven-year old girl); and (3) *United States v. Pizarro*, 2018 WL 3493073 (D. Hawaii, July 20, 2018)(sexual contact, including non-consensual intercourse, accomplished by means of force or fear).

One should not automatically default to a "sex" guideline simply because the areas Mr. Shaw touched were the breasts and buttocks of female student athletes. Context matters: Mr. Shaw was an athletic trainer. Yes, he has admitted in his plea agreement that his conduct was done "willfully," and that there was no "legitimate diagnostic or treatment purpose" for the touchings to which he has admitted. But that does not mean they were *sexual*—in fact, the defense strenuously argued that the government should be required to prove sexual intent beyond a reasonable doubt in order to convict, but the government persuaded the court to find that such proof was unnecessary.

Mr. Shaw pleaded guilty to depriving these two athletes of their right to "bodily integrity" by touching them in intimate areas without their consent. But "intimate" does not equate to "sexual." Had Mr. Shaw become angry over some perceived slight, and given one of these athletes a spanking, he would have been just as guilty of violating her right to bodily integrity, but no one in that scenario would allege that he had engaged in "abusive sexual contact." Abusive, perhaps; sexual, no.

Recall that Mr. Shaw was only able to be charged federally because he was a trainer at a publicly funded university. Since his liability hinges on his employment by the State of California, it seems only fair that we should look to California law to determine whether touching an "intimate area" is per se "sexual."

It is not. California Penal Code section 243.4(e)(1) is the statute most analogous to the conduct alleged here, and it reads (emphasis added):

> Any person who touches **an intimate part of another person**, if the touching is against the will of the person touched, **and is for the specific purpose of sexual arousal, sexual gratification, or sexual**

Glenn Agre Bergman & Fuentes LLP
New York
San Francisco
glennagre.com



> **abuse**, is guilty of misdemeanor sexual battery, punishable by a fine not exceeding two thousand dollars ($2,000), or by imprisonment in a county jail not exceeding six months, or by both that fine and imprisonment.

As you can see, the analogous California statute requires (1) touching of an "intimate part of another person," *and* (2) that it be for "the specific purpose of sexual arousal, sexual gratification, or sexual abuse." The California statute does not automatically equate touching an "intimate area" with sexual abuse; a conviction requires both the touching *and* the intent.

And this, I would submit, is where the draft report goes wrong. It reflexively defaults to a guideline that requires "abusive sexual contact" when all the defendant has been found guilty of are two misdemeanor violations of 18 U.S.C. Section 242, which is not inherently a sexual offense and does not have as an element any sexual intent.  A violation of that section does not become a "sexual" crime simply because the constitutional right violated is the so-called right to "bodily integrity."

The Sentencing Guidelines should be calculated under 2H1.1. Under 2H1.1(a)(4), the base offense level for each of Counts Two and Five is **6**. That offense level is increased by **6** levels because Mr. Shaw has pleaded guilty to acting under color of law. 2H1.1(b)(1). The Adjusted Offense Level for each count is **12.** We agree that **2** levels are added under §3D1.4 (grouping), for a Combined Offense Level of **14**. After subtracting 2 levels for acceptance of responsibility, the Total Offense Level is **12**. At Criminal History Category I, the sentencing range is 10-16 months.[10]

---

[10] Although U.S.S.G. §2A3.4 does not apply, I should take a moment also to explain why, even if it did, the two-level increase for a victim "in the custody, care, or supervisory control" should not be added. The examples in the Commentary – "teachers, day care providers," babysitters, or other temporary caretakers" – assume minor victims. Indeed, we have found no cases applying this enhancement to circumstances such as these, in which competent adult women, all in full possession of their faculties, were being seen by a trainer. To the contrary, the cases uniformly to apply to children. *See U.S. v. Miller*, 293 F.3d 468 (8th Cir. 2002) (victim 5-11 years old and referred to defendant as "Dad."); *U.S. v. Chasenah*, 23 F.3d 337 (10th Cir. 1994) (upholding § 2A3.4(b)(3) enhancement where defendant was married to the minor victim's grandmother, was regarded as the victim's grandfather, and lived in the same house); *U.S. v. Balfany*, 965 F.2d 575, 585 (8th Cir. 1992) (applying § 2A3.1(b)(3) in sexual abuse of 8-year-old

**Glenn Agre Bergman & Fuentes LLP**
New York
San Francisco
glennagre.com



**GLENN AGRE BERGMAN & FUENTES**

**Offender Characteristics**

**¶ 55.** We would ask that Ms. R▮▮▮▮ be referred to by her initials. This relationship, although relatively recent, was not particularly serious and it seems unfair to her to drag her into this situation involving a former, not-very-close paramour.

**¶ 62.** This is incorrect. You did not ask Mr. Shaw these questions and I certainly did not advise him not to answer them.

**¶ 82.** We would ask that you delete the drug testing recommendation. Mr. Shaw has no history of substance abuse and there is nothing about the offense conduct, or his personal circumstances, that would call for it.

Thank you once again, Officer Moy, for considering these comments.

        Sincerely,

        GLENN AGRE BERGMAN & FUENTES LLP

By:  _____
      David R. Callaway

---

to defendant who "effectively was S.N.'s stepfather"); *U.S. v. Castro–Romero,* 964 F.2d 942, 944 (9th Cir. 1992) (upholding § 2A3.4(b)(3) enhancement where defendant was 8-year-old victim's stepfather).

A second reason not to apply the enhancement is that it smacks of double-counting. Remember, there was no other way for the government to charge Mr. Shaw federally for this contact *except* by alleging that he acted under "color of law" based on his state employment. It is therefore fundamentally unfair to hale Mr. Shaw into federal court based on his status as a trainer for a public university *and* apply an upward adjustment because that same role purportedly placed adult student-athletes into his "custody, care, or supervisory control."

Glenn Agre Bergman & Fuentes LLP
New York
San Francisco
glennagre.com